69 So.2d 640 (1954)
TRANSPORTATION EQUIPMENT CO., Inc.
v.
DABDOUB.
No. 20049.
Court of Appeal of Louisiana, Orleans.
January 18, 1954.
Rehearing Denied February 1, 1954.
Writ of Certiorari Denied March 22, 1954.
Irving Novick, New Orleans, for appellant.
Titche & Titche, New Orleans, for appellee.
REGAN, Judge.
This is an appeal by the defendant, Louis Dabdoub, doing business under the trade name of Dabdoub Motors, from a judgment recognizing the plaintiff, Transportation *641 Equipment Company, Inc., as the owner of a 1949 Studebaker Truck, maintaining the issuance of a writ of sequestration and dismissing the reconventional demand of the defendant.
Plaintiff, the Transportation Equipment Company, Inc., had in its employ, as a salesman, Hunter O. Wagner, and, on or about January 14, 1952, he visited the offices of defendant, who conducted a used car business in the City of New Orleans, and then initiated negotiations with an employee thereof, David Rosenthal, for the purchase of a 1950 Packard automobile. Wagner informed Rosenthal that he was driving a 1949 Studebaker Pickup Truck, which was owned by the plaintiff, and that as the operation of the truck was hurting his back, he had been authorized by the plaintiff's president, Charles R. Robertson, to use the corporation's truck as a trade-in on account of the purchase price of an automobile to to used by him in effecting calls on behalf of the plaintiff. The price of the Packard car, Wagner was informed, was $1,695 plus 2% sales tax. Wagner expressed the desire to drive the car and when he returned he was of the opinion that it was a little too large, but he would again visit the lot at a later date.
On Saturday, January 19, 1952, Wagner returned to defendant's lot with the Studebaker truck and offered it plus the sum of $700 and tax to Rosenthal for the Packard car. The defendant was absent from his establishment at the moment and Rosenthal informed Wagner that he was not authorized to reduce the cash portion of the price which had been quoted to Wagner as $800. However, Wagner's interest was unabated, he again drove the Packard away from the lot and left the Studebaker truck with the defendant's salesman. At about 6:30 P.M. of the same day, Rosenthal telephoned Wagner and told him that the defendant was willing to split the difference and make it $750 cash plus the Studebaker truck. Wagner accepted this offer and said that he would return to defendant's place of business on Monday, January 21, 1952, together with the money and the legal title to the truck. Wagner arrived on Monday, January 21, 1952, and said that he was unable to procure the title to the truck as Robertson was absent from the city. On this occasion Wagner telephoned the offices of a finance company from defendant's lot and formulated tentative arrangements to obtain the cash balance of the purchase price. He then promised defendant to meet him the following day or Tuesday, January 22, 1952, with the cash and also the properly executed certificate of title to the Studebaker truck, and reaffirmed the fact that the agreement relative to the sale of the Packard and the trade-in of the truck had been consummated. He then left defendant's lot, using the Packard car as his medium of transportation.
In the early morning of Tuesday, January 22, 1952, Wagner, while in the act of driving the Packard to Baton Rouge in order to transact business on behalf of the plaintiff, wrecked the automobile. Thereafter Wagner insisted that he only had it on trial. His employer, the plaintiff, adopted the position that while Wagner was authorized to negotiate for the purchase of a car and to use its Studebaker truck as a trade thereon, it had not given Wagner absolute authority to consummate the agreement up to the moment of the occurrence of the accident.
Defendant, on the other hand, maintains that the agreement had been consummated and that title to the Packard had passed from defendant to either Wagner or the plaintiff and that, in turn, title had been transferred on the Studebaker truck from the plaintiff to defendant.
When defendant refused to relinquish possession of the Studebaker truck to the plaintiff, it caused to be issued a writ of sequestration.
Defendant then answered admitting acquisition of the Studebaker truck under substantially the same circumstances as we have related hereinabove and then reconvened for breach of the contract by plaintiff in the amount of $1,728.90 plus $350 as attorney's fees if defendant was successful in setting aside plaintiff's writ of *642 sequestration and, in the alternative, defendant was entitled to recover the sum of $950, representing damages which he incurred in consequence of the negligence of plaintiff's employee, Wagner, in wrecking the Packard automobile, while on a mission for the plaintiff.
Plaintiff has filed a plea of estoppel in this Court and points out therein that the defendant in the present suit is plaintiff in another suit, particularly proceedings No. 313,548 of the Civil District Court, wherein he has sued Hunter O. Wagner for $1,695 together with interest and costs and that suit is based upon the same facts which are set forth in the defendant's reconventional demand contained herein. Therefore, plaintiff asserts that defendant is not permitted to seek recovery from the plaintiff herein and from Wagner for the same amount arising out of the same facts and, in consequence thereof, defendant herein is estopped from urging his reconventional demand.
Ordinarily we would initially dispose of the plea of estoppel before considering the merits of the case, however, counsel for defendant during oral argument abandoned the reconventional demand, therefore, the only questions posed for our consideration are whether Wagner had been authorized by Robertson, plaintiff's president, to use its Studebaker truck as a trade-in on account of the purchase price of the Packard automobile and whether the contract of sale for the Packard automobile had been consummated?
Robertson testified that he told Wagner that the Studebaker truck was getting rather old or that it had accumulated sufficient mileage and if Wagner could procure a liberal trade-in allowance on it, he would permit him to use it for that purpose. He stated that Wagner visited two or three used car dealers and had the Studebaker truck appraised but that he turned down these evaluations because they were too low. He further said that the company usually assisted its salesmen in the purchase of an automobile if they did not already possess one, by trading in one of the company's trucks or advancing the cash for the down payment; it was approximately two months prior to the accident that Wagner approached him relative to the acquisition of an automobile of his own and in connection therewith Robertson elucidated more pertinently as follows:
"Q. Did you approve of his request? A. I told him if he could take this truck and trade it in I would sell it to him rather than put up the cash.
* * * * * *
"Q. Then, Mr. Robertson, Mr. Wagner knew you would cooperate in helping him in the purchase of a vehicle for his use as a salesman for your company, is that right? A. We would help them get the down payment.
"Q. Did you tell Mr. Wagner how much you thought that truck should bring? A. I knew what the blue book price was, and anything under that I wouldn't accept. I didn't tell him that.
"Q. What was the blue book price on it? A. I think it was around $800.00, I don't remember now.
* * * * * *
"Q. Do you have any recollection of discussing a possible purchase by Mr. Wagner of an automobile? A. Yes, sir, he had been in once or twice with appraisals of about $500.00 for that truck which I turned down. I don't remember."
The sum of $1,695 was agreed upon as the sale price for the car; $750 cash and the balance, or the sum of $945, as a trade allowance for the Studebaker truck, hence, we are of the opinion that Wagner did have authority to receive such a handsome allowance for the truck especially in view of the fact that his employer had refused several appraisals of about $500 for the truck and it knew the blue book value was about $800 and it would not accept anything thereunder. Thus, it is quite obvious that the only restriction placed upon Wagner's authority with respect to trading the *643 truck to the defendant was that the trade allowance therefor be equal to or exceed the blue book value of $800. In fact the whole tenor of the record leads to this conclusion.
We are also convinced that Wagner considered the agreement for the sale of the Packard and the trade of the Studebaker truck completed. When Wagner returned to the used car lot on Monday, January 21, 1952, and in response to a request of defendant for permission to remove the name of his company from the door panels of the truck, he replied "Do what * * * you please with it, it is your truck", this certainly is convincing proof that he considered the sale consummated. This attitude of ownership is further illustrated by the fact that when Wagner drove the Packard towards Baton Rouge the following morning, that is, Tuesday, January 22, 1952, he did not request anyone's permission nor did he advise anyone of his destination.
The testimony of defendant, his salesman, Rosenthal, and his office clerk, Joseph Bartels, clearly indicates that Wagner was at defendant's lot prior to January 19, 1952 and that he did initiate negotiations for the purchase of the Packard on January 14 or 15, 1952. Wagner testified that he did not remember visiting the lot prior to January 19th, but it is apparent from his testimony that he was laboriously endeavoring to escape liability. In short, the whole context of the record convinces us that if Wagner had not wrecked the Packard automobile, the agreement would have been eminently satisfactory to both Wagner and the plaintiff.
With respect to the question of whether title to the Packard had passed from defendant to Wagner, we are of the opinion that the car had been selected, the price agreed upon and actual delivery occurred on January 19, 1952 of both the Packard and of the Studebaker truck.
LSA-Civil Code Article 2456 reads as follows:
"Contract of saleWhen complete. The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid."
Plaintiff insists that defendant could not acquire title to the Studebaker truck in view of the militant provisions of the Certificate of Title Law, LSA-R.S. 32:701 et seq., which provide:
32:705. "On and after December 15, 1950, no person shall sell a vehicle without delivery to the purchaser thereof, whether such purchaser be a dealer or otherwise, a certificate of title issued under this Chapter in the name of the seller with such signed endorsement of sale and assignment thereon as may be necessary to show title in the purchaser; * * *."
32:706. "On and after December 15, 1950, except as provided in R.S. 32:705 and 32:712, no person buying a vehicle from the owner thereof, whether such owner be a dealer or otherwise, hereafter shall acquire a marketable title in or to said vehicle until the purchaser shall have obtained a certificate of title to said vehicle."
The foregoing provisions of the statute clearly do not make the sale of a motor vehicle void if the transfer is not executed in conformity with the statute, but simply causes the title to be imperfect until the certificate is acquired. The registration of sales of motor vehicles is an administrative proceeding which does not bear any essential relation to the contract of sale entered into between the parties. However, liability may be incurred under its penal provisions for noncompliance with the statute. In other words, the statute does not directly or by implication repeal the provisions of LSA-Civil Code Article 2456, referred to hereinabove, hence *644 title to motor vehicles, although imperfect, may still be transferred in accordance with the provisions of LSA-Civil Code Article 2456 as between the parties, even though the purchaser has not complied with the Certificate of Title law.
For the reasons assigned the judgment appealed from is annulled, avoided and reversed and it is now ordered that the writ of sequestration be set aside and plaintiff's suit dismissed at its cost.
Reversed.