HERGET, Judge.
Plaintiff instituted this suit seeking recovery of the sum of $350 representing the value of his vehicle which was a total loss as the result of an accident that occurred on or about March 23, 1958 at about 5:40 p. m. on U. S. Highway 51 near Hammond, Louisiana. The vehicle with which he collided was driven by defendant C. L. Blake-well, Jr. (Blackwell).
In the petition plaintiff filed, the allegation was made that the automobile operated by Blakewell was owned by Payne Motor Company, Incorporated and was insured for public liability by the defendant, New Amsterdam Casualty Company, then, in the alternative, the plaintiff alleged that in the event the automobile did not belong to Payne Motor Company, Incorporated it belonged to Frank Owens whose public liability insurer was the Phoenix Insurance Company. Therefore plaintiff instituted this suit against C. L. Blakewell, Jr., New Amsterdam Casualty Company, Payne Motor Company, Incorporated, Frank Owens and Phoenix Insurance Company.
On the trial of the case a stipulation was entered into by counsel for New .Amsterdam Casualty Company as to quantum and, in addition, that Blakewell was negligent.
Counsel for defendant, Phoenix Insurance Company, would not agree to stipulate that the accident happened in the way *46 in which it was set forth in the petition but did stipulate the quantum of damages.
From the evidence, there is no question but that the accident is attributable solely to the negligence of Mr. Blackwell.
Mr. Blackwell testified that at the time of the accident he was traveling south on Highway 51 and the plaintiff was traveling north on the same highway toward him. He stated he was approaching an intersection and there were three or four cars stopped ahead of him. “The front car in that line was fixing to make a left turn, therefore, I had to stop — slow down. The car that was directly in front of me did not have tail lights or anything on and I presumably got too close to the automobile, therefore I had to slow down fast and whenever I hit my brakes, due to the wet pavement, the brakes locked up as well as I can remember, the car started skidding sideways. The right side going down the highway first and the next thing I remember is the crash and that was it.”
On page 10:
“Q. Your automobile skidded into the other lane of traffic ? A. I say the front end went into the other lane of traffic, the complete car did not go into the other lane of traffic.”
Mr. Westbrook, the plaintiff, testified on pages 1 and 2:
“Q. Would you state them (then) in your own words how the accident happened? A. Yes sir, I was traveling north on 51 and I was driving about 35, 30 or 35 and he was coming down the highway and all of a sudden he just cut in my lane in the north lane going' — I was going north and he was coming south.

“Q. Did you have any warning to the collision — how far in advance did you see this car? A. About 15 feet.
“Q. What did you do when you saw — A. I hit my brakes and I couldn’t stop, just skidded right into him.
“Q. Where was the impact — what point did the two vehicles hit? A. I hit him in the right door, right side.
“Q. He was across the highway? A. Yes sir.
“Q. And you hit him in the right door? A. Yes sir.
“Q. Could you tell whether the vehicle was traveling at a fast rate of speed? A. I believe he was doing around 50 or something like that.”
The evident negligence of the driver, Mr. Blackwell, was so obvious that counsel made no serious defense on the trial to the allegations of plaintiff’s petition in this respect and on appeal counsel made no issue of the judgment of plaintiff against the defendant, C. L. Blakewell, Jr. (Blackwell).
The real issue involved is the question of the ownership of the automobile driven by Blackwell. This is so because of the contention on the part of counsel that the vehicle at the time of the accident was owned by Payne Motor Company on the one hand; and, on the other contention that the vehicle was owned by Frank Owens.
The evidence in regard to the qrtestion of the Ownership of the vehicle is best garnered from a review of the transaction by which Mr. Frank Owens obtained possession of the car. It appears from the testimony of Frank Owens that on or about the 21st of March, 1958 a Mr. Zappulo had come to the place of business of Mr. Payne on Canal Street in the City of New Orleans to see the car which was involved in this collision but Mr. Payne had sold the vehicle. He subsequently repurchased it from the vendee and at that time told Mr. Owens about Mr. Zappulo’s interest in the vehicle. Mr. Owens contacted Mr. Zappulo and he, Zappulo, came back to the Payne lot on Canal Street and looked at the vehicle and *47 asked Mr. Owens if he could bring the car to Hammond, Louisiana. After this conversation with Mr. Zappulo, Mr. Payne * * * “told me (Owens) how much I could have the car for if I wanted to bring it to Hammond.” Mr. Owens brought the car to Hammond and Mr. Zappulo conferred with Mr. Owens at his car lot in Plammond on a Saturday and stated if he decided to take the car he would be back Monday morning to get it. On the Sunday intervening Mr. Blackwell, the defendant, entered into negotiations with Mr. Owens to purchase the car and Blackwell was advised by Mr. Owens if Mr. Zappulo did not purchase it he could purchase it and negotiations were entered into with him for the purchase price which included the trade-in by Blackwell of a vehicle he owned. He, Blackwell, then requested that he be permitted to drive the automobile and try it out and it was during this trial period that the accident occurred with plaintiff.
On pages 18 and 19 of the testimony we find Mr. Owens answers to questions, as follows:
“Q. What was your arrangement with Mr. Payne in connection with the automobile? A. I had been getting cars from him for I guess, it was about four years and any time I take the car off from his lot I always paid him for the car, I didn’t pay him that day, I made an agreement that if everything was alright, I would give him $1050 for the car. I didn’J: pay that day because I always paid him after I sold.
“Q. You had the agreement in this case that if you sold the car you would pay him ? A. $1050.
“Q. And anything over this you made what would happen to that? A. That was mine.
“Q. Suppose you didn’t sell it? A. Well I don’t know about that because I never did take one away from there that I didn’t sell but that one and that one was wrecked.
“Q. Was the title to this car ever in your name? A. No.
“Q. Whose name was the title in? A. I couldn’t tell you that, because I didn’t ask Mr. Payne because I had done business with the man for four years and I know that every time I got a car from him it was always right.”
And on pages 20 and 21 Mr. Owens testified:
“Q. Were you handling his cars under the same arrangement at the time Mr. Zappulo came in? A. Well I was getting cars sometimes and I would bring them to Hammond. Sometimes I would buy three cars from him and sometimes I would get four.
“Q. Then if you sold the cars you would pay for them? A. Yes, sir, sometimes I would pay him when I bought them the same day, that particular one I didn’t.”
On cross-examination to questions by Mr. Fontenot, on page 22, he testified:
“Q. Now is it not a fact, that the Chevrolet automobile being driven by Mr. Blakewell on March 23, 1958, had been purchased by you from Mr. Payne for the sum of $1050?
“By Mr. Hyland: I object to that— that is a matter for the Court to determine.
“By the Court: I will let him answer it. The Court will overrule the objection.
“A. I had made a deal with him, I would bring the car to Hammond and I would sell the car and I would bring him $1050.
“Q. Is it not also a fact, Mr. Owens, that even if you had been unsuccessful in selling that car you owed Mr. Bill Payne $1050? A. That wasn’t talked about that. I mean if I didn’t sell it, he didn’t say nothing about that be *48 cause I never did have to take one back to him.
“Q. And by the same token, there was no conversation between yourself about bringing it back in case you didn’t sell it, isn’t that a fact? A. I never had thought anything about it because I didn’t have to take one back to him.”
And on page 24:
“Q. Mr. Owens, did you not in fact have the power and authority at that time, if you saw fit, to sell that car for say $850.00? A. I could have sold it for $500, just so long as I give that man over there $1050.
“Q. You could have sold it for $5 if you saw fit, as long as you paid him the $1050? A. Yes.”
On page 26:
“Q. And in point of fact, Mr. Owens, in all of your dealings with Mr. Payne, the title transaction had not occurred until you had paid him for the car you had bought from him, isn’t that correct? A. That is correct, after I paid him I always picked up the title. After I paid him sometimes I wouldn’t pick it up until a couple of days then, if I was busy doing something I would send the money to him and then I would pick up the title later.”
Mr. Owens was testifying on redirect examination in response to the queries about the financing of a sale made by him and. on page 28, he answered:
“A. No sir, I had to take the papers in and maybe I might have given it to Mack Brough or else with Dealer’s Discount and then I had put some through Allen Parker in New Orleans. I didn’t have no regular finance company, which ever one would buy the deal that is the one I would give it to.”
Mr. Payne, in describing the transaction entered into by Payne Motor Company with Mr. Frank Owens, testified on page 29:
“Q. Now the ’55 Chevrolet convertible automobile, which was involved in the wreck on March 23, 1958 and forms the basis of this action, did you sell that car to Mr. Frank Owens? A. Yes sir.
“Q. What was the date of that sale, the approximate date? A. It (was) on a Friday prior to the accident.
“Q. Now was that the first time that you had sold an automobile to Mr. Owens? A. No sir.
“Q. Now Mr. Payne, was that transaction whereby you parted with this automobile, was that a sale by you to Mr. Owens or was Owens your agent handling that car on a commission basis?
“Mr. Hyland: I object to this line of1 questioning. That is a question for the Court to determine.
“By the Court: I will let him testify as to what his arrangement was or whether he sold it to him or whether he was acting as his agent. I will pass on the facts after I hear the testimony.
“Mr. Fontentot (Fontenot) : Answer the question, please.
“A. I sold it to him.
“Q. What was the price of the cart (car) ? A. $1050.
“Q. Was there any condition upon his paying that $1050.00, Mr. Payne? Did he owe you that money for that car? A. Mr. Fontenot, this was on a Friday, Frank came in there with this young fellow, Zappola, and he said that Zappola wanted to buy the automobile. I knew that Mr. Zappulo was interested in the car of that type and Frank says, he will buy and if he doesn’t buy I will have somebody else to buy it but if he doesn’t buy it I will floor plan it *49 and pay you Monday. That was Friday, Saturday and Sunday, Frank knows and you know that is our busy day and we don’t want an automobile off the lot without it is sold over the weekend.”
On page 31:
“Q. Was there any agreement express or implied, with Mr. Frank Owens that he could bring that car back to you the next day and welsh on the deal, as it were? A. No sir.
“Q. Was he on your payroll as a salesman or as an agent? A. No sir.
“Q. Had you paid any social security or employment taxes on him? A. No sir.”
On cross-examination, at pages 34 and 35, Mr. Payne testified:
“Q. In this deal he was to sell the car and give you $1050.00? A. He bought the car, I sold Mr. Owens the car for $1050.00 and he said I will pay you Monday.
* * * * #
“Q. Suppose he had been unable to sell the car to Zappoio or anyone else and had been unable to pay you, could he have brought that car back? A. I wouldn’t have been happy about it.
“Q. Would you have taken it back? A. If I can’t get my money I would have to take my car.
“Q. You would have taken it back and put it on your lot and try to sell it to someone else, is that right? A. That is generally what you do.”
On redirect examination by Mr. Fon-tenot, page 35:
“Q. Mr. Payne, Mr. Hyland just asked you if you might have taken that car back, would you have been obligated to take that car back? A. No.
“Q. Could you have insisted if you had chosen on payment if you wished? A. Yes sir.”
Further corroboration that the transaction between Payne and Owens was actually a sale is evidenced by the fact Mr. Payne testified he had collision insurance on the automobiles owned by him in connection with his business with New Amsterdam Insurance Company and he did not report the loss of the automobile involved in this accident which he had sold to Mr. Owens and did not make a claim on his collision insurer. Mr. Owens, at page 23, testified that he reported the loss of this Chevrolet to his collision insurer and also to his liability carrier, Phoenix Insurance Company, defendant.
We have quoted rather extensively from the testimony in regard to this transaction so that a resolution could be made of the question of whether or not (1) a sale, in fact, took place between Mr. Payne and Mr. Owens, as contended by plaintiff; or (2) Mr. Owens was simply acting in the capacity as agent for Mr. Payne, or (3) if not as agent, the contract contained a sus-pensive condition as contended by counsel for defendant, Phoenix Insurance Company.
Article 2456 of the LSA-Civil Code provides :
“Completion of contract by agreement as to object and price
“The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid.”
In the circumstances presented by this factual situation, it is our opinion the transaction between Mr. Payne and Mr. Owens was a sale within the meaning of the above-quoted article of the Civil Code inasmuch as it is evident that there was an agreement for the object, the 1955 Chevrolet automobile, and for the price thereof, $1050. There was no proof of any agency agree *50 ment between Payne and Owens and the basis for same lies only in the argument of counsel; similarly is this so in regard to the suspensive condition.
Defendant, Phoenix Insurance Company, further contends that as no title certificate was executed by Payne to Owens there was no translation of the ownership of the 19SS Chevrolet. We believe this question has been settled contra to the contention of this defendant and refer to the case of Flatte v. Nichols, 233 La. 171, 96 So.2d 477, where, on pages 479 and 480, we find our Supreme Court saying:
“It is argued by the plaintiff-appellant that the Louisiana Motor Vehicle Title Certificate Law, LSA-R.S. 32:-705, repeals, modifies and alters the basic provisions of Article 2456 of the LSA-Civil Code. This contention has been answered in Transportation Equipment Company v. Dabdoub, La.App., 69 So.2d 640 wherein it was clearly stated that LSA-R.S. 32:701 et seq. do not make the sale of a motor vehicle void if the transfer is not executed in conformity with the statute, but simply causes the title to be imperfect until the certificate is acquired, nor do the provisions of LSA-R.S. 32:701 et seq. directly or by implication repeal the provisions of' Article 2456 of the LSA-Civil Code. The court stated that title to motor vehicles, although imperfect, may still be transferred in accordance with provisions of Article 2456 as between the parties even though the purchaser did not comply with LSA-R.S. 32:701. In Hammer [Hamner] v. Domingue, La. App., 82 So.2d 105 it was held that failure to comply with the administrative regulation of LSA-R.S. 32:705 does not invalidate the sales themselves but such failure only prevents a ‘marketable title’ from being obtained until such time as the provisions of the statute are complied with but a valid title is perfected even before the purchaser obtains a title certificate. To the same effect are the cases of Nettles v. General Accident Fire & Life Assurance Corporation, 5 Cir., 234 F.2d 243; Bedsole v. Lee, La.App., 78 So.2d 434; Hammond Finance Co. v. Carter, La.App., 83 So.2d 682; H. G. Williams Motor Co. v. Zeagler, La.App., 92 So.2d 291.”
Though, as stated in the beginning of this opinion, suit was filed by plaintiff against C. L. Blakewell, Jr. and New Amsterdam Casualty Company and, in the alternative, against C. L. Blakewell, Jr., Frank Owens and Phoenix Insurance Company, the judgment which was rendered, for oral reasons, was in favor of the plaintiff and against Frank Owens and his insurer in the sum of $350 with legal interest from date of judicial demand and all costs, as shown by the certified copy of the court minutes of date March 28, 1960, and on April 1, 1960, we find: “Judgment signed in open court in Amite, Louisiana, this 1st day of April, I960.,” which judgment shows: “ * * * judgment in favor of the plaintiff, David Westbrook and against the defendants, C. L. Blakewell, Jr., Frank Owens and -the Phoenix Insurance Company, in solido, in the full sum of Three Hundred Fifty and 00/100 ($350.00) Dollars, together with legal interest thereon from date of judicial demand until paid, and for all costs of this suit.”
It was from this judgment that C. L. Blakewell, Jr., Frank Owens and the Phoenix Insurance Company took this appeal.
It is to be noted that no judgment was read, rendered or signed in favor of and/or against defendant New Amsterdam Casualty Company and therefore any issues pertaining to the claim of David West-brook against this defendant is not before the Court.
For these reasons, the judgment signed by the Trial Court will be affirmed.
Judgment affirmed.