BARNETTE, Judge.
On November 18, 1963, the plaintiff Edgar Frank Blanchard sustained physical injuries caused by an unoccupied Volkswagen automobile coasting down an inclined driveway on a used car lot, pinning him against a car that he was inspecting at the time. The Volkswagen had been left in its precarious position only moments before by the defendant Sam Ogima.
At the time of the injury, Blanchard was acting in the course of his employment for Mike Persia Chevrolet Company. He had brought a Chevrolet automobile to Reliable Motors Used Car Lot on Canal Street in the City of New Orleans to obtain an offer of purchase from Reliable. While he and the prospective purchaser were standing in front of the car with the hood open, in the act of inspecting the motor, Ogima entered the lot from the opposite direction and stopped the Volkswagen facing the Chevrolet. Ogima got out and joined the other parties standing in front of the Chevrolet. It was at this moment that the Volkswagen, without warning, coasted down upon them, causing Blanchard’s injuries. Ogima evidently did not set the emergency brake or place the car in gear before leaving it.
The negligence of Ogima is not seriously disputed, nor was there any attempt at trial to prove the contributory negligence alleged against Blanchard as a bar to his recovery of damages.
Since the injury sustained by Blanchard occurred in the course of his employment, he was paid workmen’s compensation and medical expenses by The Home Indemnity Company, the compensation insurer of Mike Persia Chevrolet Company. Home Indemnity joined Blanchard as a party plaintiff, seeking recovery of the compensation paid.
Made defendants in the case by plaintiffs’ original petition were Ogima and Vincent Russo, doing business as Russo Motors, the owner of the Volkswagen. Ogima was alleged to be employed as Russo’s salesman, and it was contended that Ogima was acting in the course and scope of his employment at the time of the' accident. Suit was filed May 5, 1964; but, for some unexplained reason, Russo was not served until February 23, 1965.
Russo answered denying Ogima’s employment by him, pleading in the alternative, contributory negligence. He impleaded the General Guaranty Insurance Company, his alleged insurer, who had denied coverage and refused to defend Russo,[1] and prayed *377 for judgment against General Guaranty for such sum as he might be cast. Russo also prayed for the statutory penalty and attorney’s fees for having to defend the suit himself.
At this point the plaintiffs filed a supplemental and amended petition, making General Guaranty a party defendant along with Ogima and Russo. Paragraph III of their original petition was amended to allege that Ogima and Russo were engaged in a joint venture for the sale of automobiles, including the Volkswagen.
Ogima filed no pleadings and was not represented by counsel in the trial court, although he was present throughout the trial and was given opportunity to plead and appear in proper person. He made no plea nor defense in behalf of himself.
On trial below plaintiffs’ claims were resisted by Russo and General Guaranty, while the issue of insurance coverage was resisted by General Guaranty both against plaintiffs and Russo. There was judgment for both plaintiffs against Ogima only; for plaintiff Blanchard, in the sum of $7,-500; and for plaintiff Home Indemnity for $781.52. Ogima did not appeal. Both plaintiffs appealed from that portion of the judgment rejecting their demands against Russo and General Guaranty. In addition, plaintiff Blanchard has appealed the issue of quantum and is seeking an increase. Russo has appealed, insofar as the judgment dismisses his third party demand against General Guaranty.
We accept as conclusive the negligence on the part of Ogima, and the absence of contributory negligence on the part of Blanchard. Unquestionably the plaintiffs are entitled to recovery against Ogima, but the question we must decide is whether they are also entitled to recovery from Russo and/or General Guaranty. Whether or not Russo is liable to plaintiffs, we must also determine if General Guaranty has breached its contract with Russo in refusing to defend him in this suit.
Specifically, the issues which we must decide are:
1. If Ogima was an employee of Russo acting in the course and scope of his employment;
2. Whether there was a joint venture relationship between Russo and Ogima for the sale of used automobiles including the Volkswagen in question;
3. If there was an agency relationship between Rússo, as principal, and Ogima, as agent, for the sale of the Volkswagen; and, if so, whether Ogima was acting within the scope of that agency at the time of the accident in question;
4. If Ogima was an independent contractor as found by the trial judge;
5. Whether the Volkswagen was covered by the Garage Liability Policy issued August 22, 1963, by General Guaranty Insurance Company to Vincent J. Russo, doing business as Russo’s Kar Guard Muffler Shop, 1111 North Broad Street;
6. If Russo is entitled to judgment for the statutory penalty and attorney’s fees on account of General Guaranty’s refusal to defend the suit in his behalf; and
7. Quantum.
The issue of principal and agent relationship between Russo and Ogima was not pleaded in the court below and was raised for the first time by briefs and argument in this court. Under the authority of LSA-C.C.P. art. 2164, we will • consider this issue since the record before us on this appeal contains all evidence necessary to determine the question. It is an issue of material significance, as will be pointed out *378 below, which could determine a just, legal and proper judgment herein.
The testimony of the witnesses is contradictory. The trial judge, in his reasons for judgment, expressed his doubt of the reliability of the testimony in certain respects. He observed that some of it had been “tailored” to fit certain needs. From a reading of the transcript and being fully aware of the weight to be given to the factual findings of the trial judge, we find the following facts upon which our conclusions of law will be based.
Mr. Vincent Russo individually owned and operated Russo’s Kar Guard Muffler Shop at 1111 North Broad Street in the City of New Orleans. “Kar Guard” is a trade name for a certain kind of automobile muffler. Mr. Russo had a franchise for the sale and installation of such mufflers and the right to use the name “Kar Guard” in connection with his business at 1111 North Broad Street. In addition to installation of mufflers and automobile repairs Mr. Russo bought and sold used cars. He had a 1963 Motor Vehicle Dealers License issued by the State of Louisiana to engage as a dealer in used passenger cars, in the name Russo Muffler Shop, 1111 North Broad Street.
He was questioned if the Kar Guard Muffler people had objected to his engaging in a used car sales business at the same address for which his franchise was granted, but he denied any comments by Kar Guard to this effect. However, he did open a used car lot at 442 North Broad Street, and an occupational license for the sale of used cars was issued by the City of New Orleans in the name of Vincent Russo, doing business as Russo Motors, at that address, August IS, 1963.
Mr. Walter Kahn, Revenue Collection Supervisor for the Bureau of the Treasury, City of New Orleans, testified that since 1961, Vincent Russo, as an individual owner, had a certificate of registration for sales tax purposes for “Russo’s Muffler Shop,” 1111 North Broad Street. The tax is computed under a coding system indicating “retail automotive supplies other than auto dealer.” A different code number indicates “auto dealer,” and the method for computing such an operation’s taxes are determined under a separate section of the Occupational License Ordinance. Mr. Kahn testified that the record shows the automotive retail parts operation at 1111 North Broad Street had continued and was in existence at the date of trial. His record showed that the registration for automotive sales was closed out at 442 North Broad Street on February 28, 1965, and was transferred, effective March 1, 1965, in the name “Russo Motors,” 1111 North Broad Street.
It was explained by Mr. Russo that the state license is a general authorization and covered his operations at any address, but that the City requires a separate occupational license for each address.
We must conclude from these facts that between August 15, 1963, and March 1, 1965, Mr. Russo’s used automobile sales business was conducted from Russo Motors (also referred to as Russo Motor Sales) at 442 North Broad Street. This is our opinion notwithstanding the fact that all of his bookkeeping and clerical records on used car sales were kept at 1111 North Broad Street. He testified that throughout the entire time he conducted the sales business at 442 North Broad Street all of his records were kept at 1111 North Broad Street and that all sales transactions from 442 were recorded through Russo Muffler Shop.
On September 18, 1963, Mr. Russo purchased from Greater Jackson Auto Auction, Inc., Jackson, Mississippi, the used Volkswagen automobile in question for $635. It was bought in the name “Russo Muffler Shop.”
The defendant Sam Ogima was a used car salesman, a kind of free-lance individual known in the trade as a “bird dog” salesman. *379 The term derives from the practice of “flushing” out a prospect for a certain type of car. The salesman then goes to a dealer who might have such a car for sale and works out a deal for which the “bird dog” salesman is paid a commission, or he might be allowed to keep all he can get above a given figure. On this basis Ogima had done business with Russo and many other local dealers.
Shortly prior to November 18, 1963 (the exact date was not stated), Ogima and Russo made a verbal agreement whereby Ogima subsequently rented a lot in Gentilly from which used cars were to be offered for sale. Russo agreed to provide five used cars, not including the Volkswagen, with which Ogima was to begin the venture in Gentilly. Having no money or other resources, Ogima also prevailed on Russo to pay (or advance) the $200 required for the first month’s rent on the lot. No bill of sale or other evidence of transfer was executed. No note or other evidence of loan was given for the $200. No time limit was mentioned, nor was any testimony given of the sales price on the cars placed on the Gentilly lot. Ogima and Russo were not entirely in agreement on how the sales of the cars would be handled nor the division of profits. Ogima said the profit would be “split down the middle.” At another time he said Russo would give him a price and all he could get above that figure would be his. Russo said Ogima was to keep half the profit and give him half until the $200 “loan” was paid. He also said Ogima was to “floor plan” the cars with a lending agency and pay him for them; he took the cars back when Ogima was unable to manage this.
Apparently Russo had little or no control over Ogima’s sales contacts or methods. His only interest was to dispose of the cars he had for sale at a profit. Russo retained title to the cars placed with Ogima and would have agreed to no sale unless the price and terms were acceptable to him. To this extent he retained control. Either party was free to terminate the agreement at any time, and Russo did terminate it after about a month. No cars were sold and all five were taken back by Russo. The $200 advanced for rent was never repaid, nor does it appear that any demand for payment was ever made.
While this agreement was in effect, Ogima told Russo he had a prospect interested in the purchase of the Volkswagen. There is no question whatever that Russo had bought the Volkswagen for resale and that it was then for sale. It was actually sold within a month by F. J. Welsch, Russo’s lot salesman at 442 North Broad Street. However, Russo told Ogima he was not interested in selling the Volkswagen. It appears that he considered the Volkswagen saleable, and there was no point in selling it through a “bird dog” salesman with a division of profit, when he could probably sell it himself for a greater net profit. This conversation between Russo and Ogi-ma took place at 1111 North Broad Street. Ogima went directly to the lot at 442 North Broad Street and got the Volkswagen without any explanation requested by or given to F. J. Welsch, Russo’s salesman in charge of the lot. Apparently Welsch considered this not unusual. Ogima said: “He [Russo] didn’t exactly like tell me to take it [sic]. He said he’d rather sell it.” Pressed for further explanation he said: “Because I’ve done it many, many times before. I’ve sold — I’ve picked up cars from him, and I brought him his money, and I kept my commission.”
From 442 North Broad Street, Ogima went to Reliable Motors on Canal Street for a friendly visit and to have a cup of coffee with his salesman friend there, after which he said he intended to contact his prospect. Following the accident he took the Volkswagen to his Gentilly lot. He made no report of the accident. It is not clear when he made contact with the prospect.
It is quite significant that when Russo learned that Ogima had taken the *380 Volkswagen from his used car sales lot he made no demand for its return. It remained in Ogima’s possession for about a week until it and the five other cars were taken back. We, therefore, hold that Ogima had possession of the Volkswagen with Russo’s permission and consent — if not express, at least by tacit consent. He ratified Ogima’s act by his silence and acquiescence. We have not the least doubt that had Ogima returned to Russo with a good price offer, it would have been accepted.
From these facts we hold Ogima was not an employee of Russo over whom he exercised the usual control and supervision. We also hold that there was no joint venture agreement between them. Walker v. Simmons, 155 So.2d 234 (La.App.3d Cir. 1963); 25 Tul.L.Rev. 382.
In support of his contention that a relationship of principal and agent did not exist, counsel for Russo has cited Westbrook v. Blakewell, 126 So.2d 44 (La.App.1st Cir. 1961), which he argues is more pertinent than Morton v. American Employer’s Ins. Co., 104 So.2d 189 (La.App.2d Cir. 1958), cited by plaintiff. We do not agree. In Westbrook the facts clearly support the conclusion that the automobile had been sold by the used car dealer to another dealer who in turn permitted a prospective purchaser to drive it, resulting in an accident. The purchaser-dealer was held liable. The facts here clearly distinguish this case. Ogima was not a purchaser-dealer.
The Morton case presents a factual situation much more similar to that presented here as will be seen from the following:
“ * * * The transaction between Busher and Whitney was one which surely is not unusual in the used automobile business in which both Whitney and Busher were engaged. The Chevrolet involved in the accident was delivered by Whitney to Busher with the agreement Busher would sell the car and keep that part of the purchase price in excess of $300 for himself as profit. Busher did not purchase the vehicle from Whitney, but simply had authority to find a buyer for it. It was conceded by both parties no specified length of time was agreed upon in which the cars secured by Busher from Whitney were to be sold, or turned back, and either party could have called off the deal at any time. Busher did not receive a title certificate covering the Chevrolet and following the accident Whitney removed his other two vehicles back to his own sales lot. These facts, in our opinion, show quite clearly Whitney merely appointed Busher his agent or attorney for the purpose of selling the vehicle. In delivering the car in question to Busher, it was unnecessary for Whitney to expressly confer power to perform functions by his agent such as are customarily performed in the ordinary course of business without expressed authority. LSA-C.C. art. 3000 makes this point clear:
‘Powers granted to persons, who exercise a profession, or fulfill certain functions, or doing any business in the ordinary course of affairs to which they are devoted, need not be specified, but are inferred from the functions which these mandataries exercise.’
“As a result of the agreement between Busher and Whitney, Busher was authorized to do the customary things necessary to bring about a sale of the automobile entrusted to him for that purpose and he was acting within the scope of his authority when he gave permission to Casey to operate the vehicle as a prospective customer. We find Whitney acting through Busher, impliedly gave permission to Casey to use the automobile. Bankers and Whitney argue further that the relationship between Busher and Whitney was not that of agent and principle, but, in fact, falls into the classification of an independent contractor and principal contractor. The conten *381 tion is untenable in view of our findings above set forth, but cited in support of this contention is Amyx v. Henry & Hall, 1955, 227 La. 364, 79 So.2d 483. That case involved a workmen’s compensation claim and is entirely inap-posite for therein it was held the doctrine of respondeat superior applied, and Amyx was held not to be an independent contractor. Our conclusion is as stated above, that Whitney and Busher as to the transaction between themselves, were principal and agent.” 104 So.2d at 192-93. (Emphasis added.)
Applying the test used by the Supreme Court in Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483 (1955), cited in Morton, supra, we must conclude as did our brothers of the Second Circuit in Morton that the necessary elements of independent contractor status are not present here nor were the elements of employer-employee. The relationship between Russo and Ogima was that of principal and agent.
There is, however, one crucial difference between this case and Morton. Here the agent, Ogima, was not acting within the scope of his authority when the act of negligence giving rise to this suit was committed. His act in taking the Volkswagen on a personal mission to Canal Street was a deviation from the course of duty imposed by the agency for which Russo cannot be held liable. Leckie v. H. D. Foote Lumber Co., 40 So.2d 249 (La.App. 2d Cir. 1948); Como v. Union Sulphur Co., 182 So. 155 (La.App. 1st Cir. 1938) ; Nance v. United Fruit Co., 15 La.App. 316, 131 So. 738 (La. App. Orleans 1930).
For these reasons the plaintiffs’ demands against Russo must be rejected.
This brings us to the question of insurance coverage. We have already stated our opinion that the Volkswagen was in the possession of Ogima at least with the tacit consent and implied permission of Russo; and therefore, under the terms of the policy, Ogima would come within the definition of “Persons Insured” if the Volkswagen was covered by the policy in question.
The policy in question was issued August 22, 1963. The named insured is “Vincent J. Russo, DBA Russo’s Kar Guard Muffler Shop, 1111 North Broad Street, New Orleans, Louisiana.” The pertinent provisions are:
“The ownership, maintenance or use of any automobile for the purpose of garage operations, and the occasional use for other business purposes and the use for non-business purposes of any automobile owned by or in charge of the named insured and used principally in garage operations, and
‡ ‡ i{t
“ ‘garage’ means an automobile sales agency, repair shop, service station, storage garage or public parking place 3jc * ‡ »
A vigorous attempt was made by Mr. Russo to show the Volkswagen was within the foregoing coverage provisions. Considerable testimony was given to show that it was used to run errands and was used by Mr. Russo personally. A friend Lloyd Per-roncel, a resident of Lafayette, testified that he comes to New Orleans frequently by train and that his friend Russo provides him with an automobile while in the City. On occasions he loaned him the Volkswagen which he kept at the muffler shop at 1111 North Broad Street.
Alexander Howard, an employee of Russo at the muffler shop for about two and a half years ending in June, 1965, was called as a witness for General Guaranty. Pleading surprise at some of his answers, counsel for General Guaranty' was permitted to cross-examine the witness and established that Howard had given the following statement:
“The Volkswagen Mr. Ogima took was kept at the used car lot in the 400 block of North Broad. It was down at the muffler shop only a couple of times to be worked on, or serviced. The Volks *382 wagen was not used around the muffler shop to do any work there. It was always on the other lot at 400 N. Broad, unless some work had to be done on it. As far as I know or can remember the Volkswagen was not used personally by Mr. Russo or any of his employees.
“The only vehicle used at the muffler shop for work around there or to run errands, or to go on service calls, was a Jeep. I never saw Mr. Russo or any of his employees use the Volkswagen for any errand, service call or other purpose. It was only held for sale. Sometimes it was demonstrated to customers who were looking for a car to buy.
[Signed] I. Alexander Howard
“Have read all of the above statement and every thing to the best of my knowgly [sic] is true. I can also add that Mr. Russo did not allow no one [sic] to drive any of his cars without him knowing about its whereabout. This Voschwagon [sic] was always kept at the 400 block of North Broad unless it was at the muffler to be serviced or check [sic].
[Signed] Alexander Howard 8821 Nelson St.
5/7/66”
Considerable testimony was given on the contention that there might have been two Volkswagens involved. Attempts were made to show the identity of each Volkswagen. There was also testimony that the model described was not manufactured until 1965. We are not impressed with these statements.
Testimony was given to the effect that the Volkswagen was sent from the muffler shop to the used car lot only to be washed and not to be left there for the purpose of sale. Mr. Russo was quite emphatic that he intended to keep it and use it in connection with his muffler shop business. On this disputed factual question the trial judge found as follows:
“The Court has previously stated, found a great difficulty to determine the facts on this question from the evidence adduced. A great deal of the evidence was tailored to protect Mr. Russo, and this is no accusation or intention of accusation against either Mr. Russo or his attorney, but I think it was a great desire of some of the witnesses to protect Mr. Russo when they realized that the occasion called for such protection. The fact remains a simple fact, the only concrete fact which this Court can find is that at the time Ogima picked up the vehicle in question it was located at 442 North Broad Street and not at 1111 North Broad Street. At that time it was located on a lot which had offered him vehicles for sale. And whether or not the car was placed there merely for the purpose of washing or for the purpose of sale, this Court cannot determine from the evidence. Therefore, it must only look to the physical fact that the car was located at 442 North Broad at the time that it was taken by Mr. Ogima * * * ”
We find no manifest error in this finding of fact.
We have already stated our opinion that the Volkswagen was bought for resale, pointing out that it was in fact sold within a month (December 13) after the accident by Mr. Welsch, Russo’s salesman in charge of the used car business at 442 North Broad Street. The fact that the sale was passed and delivery was made at the muffler shop is of no significance, since all sales were channeled through that establishment.
Mr. Chris Arnos, the insurance agent through whom the policy in question was written, testified that he and an underwriter, Robert Bentley, personally went to Russo’s Muffler Shop to determine the nature of his business. Arnos said: “And he had four or five cars parked on his prem *383 ises for the wholesale purposes.” He further testified as follows:
“Q And you concluded that this was the policy that would give him coverage both as to his muffler shop and those vehicles that he had on—
“A Owned and used in normal operations of his business.
“Q Also had for sale in his business?
“A Yes.
“Q And that’s the purpose for which you sold him this policy?
“A The policy, yes, sir.

“Q Does the policy insure any other operation of Vincent Russo, any place else?
“A Well, his operation, but any — in other words anywhere he operates out of — outside of this location, and as an individual location, would not be covered. But, any automobile used in the normal operation of his business, owned by Mr. Russo, is covered under this policy.
“Q Right. If it was used out of this location, is what you’re talking about ?
“A Yes, sir.”
He stated that he had no knowledge of Mr. Russo’s retail business at 442 North Broad Street. Therefore, there could have been no intention to extend the coverage to the cars on the retail sales lot. Therefore the Volkswagen was not covered unless it was a utility vehicle used in the garage operations. We have held that it was not such a vehicle, but one held for sale at retail through Mr. Russo’s retail sales business, a conclusion strengthened by the fact that it was soon thereafter sold.
The point was raised that the insurance premiums were determined in part by a formula related to the payroll of the muffler shop. Periodic audits of the payroll were made by the insurance company. Sales commissions paid the employees were included in that computation. From this fact it is argued that the coverage extended to the Volkswagen, since a part of the premium for the insurance resulted from the sale of used cars.
We can make no distinction between the Volkswagen and any other car on the used car lot under the name Russo Motors (or Russo Motor Sales) at 442 North Broad Street. Let us assume Ogima had injured plaintiff Blanchard with some other car that he might have taken from that lot. Could it not be argued with equal validity that this other car was covered by the terms of the policy? Such an interpretation would lead to an absurdity. General Guaranty did not insure all the used automobiles Russo might have from time to time for sale, wherever located. Its coverage was limited to the muffler shop operations and the utility cars used in connection therewith at 1111 North Broad Street. We therefore, hold that the Volkswagen was not covered.
Having reached this conclusion, the question of coverage of the Volkswagen in possession of Ogima with Russo’s permission is disposed of.
This conclusion likewise precludes any discussion of General Guaranty’s liability for refusal to defend this suit on behalf of Mr. Russo.
We turn now to the question of quantum of damages which must be considered since the plaintiff Blanchard has appealed seeking an increase of award. Mr. Ogima has not appealed and the judgment against him in the amount of $7,500 is final unless increased.
There is relatively brief medical testimony in the record. Mr. Blanchard went, on the day of the accident (November 18), to Baptist Hospital where he was treated by Dr. Dan D. Baker. Examination revealed contusion of the right leg and frac *384 ture of the right patella. A long leg cast was applied. He was discharged from the hospital on November 22. He continued under Dr. Baker’s treatment and made office visits through March of 1964. At that time he was discharged as able to return to work. Dr. Baker said there was no disability in his knee at the time of discharge, but that some pain and discomfort would be expected until complete recovery. He stated that there would be no instability in the knee.
Mr. Blanchard was examined by Dr. Irving Redler on May 20, 1964, and by Dr. Alfred B. Longacre on July 8, 1966. Dr. Redler’s examination including an X ray did not reveal a fracture, but he said, assuming a fracture as the history indicated, it had healed perfectly. There was some evidence of residual disability, evident from the reduction in knee-bending limits. Dr. Redler said he would have prescribed muscle-strengthening exercises, which should have improved Blanchard’s condition in two months.
Dr. Longacre testified that Mr. Blanchard had weakness in his right leg raising, but no limitation of motion. An X ray was taken which he said: “ * * * showed a fracture of — a dislocation. * * * There is a slight degree of osteoarthritis showing change about the knee.” Based on the patient’s statement that his knee had collapsed on occasions, Dr. Longacre said he could have this trouble with or without fracture. He described the condition as being like a “tennis knee” — that which is often experienced by tennis players — and not necessarily associated with fracture.
Mr. Blanchard asks $3,000 for loss of commissions during his period of disability. Evidence was given of earnings for like periods the previous year and the following year. From these figures it is reasonable to assume that he lost in commissions from $1,000 to $2,000.
The judgment of $7,500 is not itemized; and we have no way of knowing what proportion was allowed for loss of wages, pain and suffering, or disability. It is, in our opinion, adequate to compensate fully for all claims. There was certainly no abuse of discretion by the trial judge in this respect, and we see no reason to burden this opinion with citations of authorities holding that in such cases the award of the trial judge should not be disturbed.
The award of $781.52 to the plaintiff The Home Indemnity Company was stipulated and is not an issue on this appeal.
The judgment appealed from is affirmed in all respects, including costs in the trial court. Costs of this appeal are assessed to appellants in equal proportion.
Affirmed.

. Russo notified General Guaranty of the suit about March 1,1965. General Guaranty refused to defend Russo for failure of timely notification. Upon learning that Russo was not served and had no knowledge of the accident or suit until Feb *377 ruary 23, the insurer undertook the defense. Discovery deposition of Ogima was then taken which revealed that the ear in question was taken by Ogima from a business and address not covered by the policy. General Guaranty then withdrew its defense of Russo.